IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 22, 2018

**BASHAN MURCHISON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Sullivan County**
**No. C67272   James F. Goodwin, Jr. , Judge**

————————————————————

**No. E2017-02143-CCA-R3-PC**

————————————————————

A Sullivan County jury convicted the Petitioner, Bashan Murchison, of nine counts of felony drug offenses.  The trial court imposed an effective sentence of fifty years in the Tennessee Department of Correction.  On appeal, this court affirmed the judgments and sentence.  *See State v. Bashan Murchison*, No. E2014-01250-CCA-R3-CD, 2016 WL 659844 (Tenn. Crim. App., at Knoxville, Feb. 12, 2016), *perm. app. denied* (Tenn. Aug. 18, 2016).  The Petitioner filed a post-conviction petition claiming that he had received the ineffective assistance of counsel, and the post-conviction court denied relief following a hearing.  On appeal, the Petitioner maintains that his counsel was ineffective.  After review, we affirm the post-conviction court's judgment.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and THOMAS T. WOODALL, J., joined.

Lindsay K. Earhart, Kingsport, Tennessee, for the appellant, Bashan Murchison.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Barry P. Staubus, District Attorney General; and Kent L. Chitwood, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts and Procedural History**
**A. Trial**

The Petitioner and his co-defendant,[1] Garrick Graham, were charged with numerous counts of drug-related offenses. A Sullivan County jury convicted the Petitioner of delivery of .5 grams or more of cocaine within 1,000 feet of a school zone (count 9), sale of .5 grams or more of cocaine within 1,000 feet of a school zone (count 10), delivery of .5 grams or more of cocaine within 1,000 feet of a child daycare facility (count 11), sale of .5 grams or more of cocaine within 1,000 feet of a child daycare facility (count 12), facilitation of the delivery of .5 grams or more of cocaine (count 13), sale of .5 grams or more of cocaine (count 14), sale of .5 grams or more of cocaine within 1,000 feet of a school zone (count 15), delivery of .5 grams or more of cocaine within 1,000 of a school zone (count 16), conspiracy to sell more than 26 grams of cocaine within 1,000 feet of a school zone (count 21) and conspiracy to deliver more than 26 grams of cocaine within 1,000 feet of a school zone (count 22). On direct appeal, this court summarized the evidence presented at the Petitioner's trial as follows:

> Corporal Ray McQueen of the Kingsport Police Department . . . was contacted by John Dukes about working as a confidential informant (CI) in the investigation of Defendant Garrick Graham and [the Petitioner]. Mr. Dukes had previously been convicted of a drug crime in Virginia and spent three months in jail. Since he was enlisted in the United States Army at the time of the offense, Mr. Dukes also spent three months in confinement as a result of a court martial. Mr. Dukes had met Defendant Graham in 2010 at the home of Mr. Dukes' sister, Keanna Duke, [ ] in Kingsport, Tennessee. [The Petitioner] also had a relationship with Mr. Dukes'[s] other sister. In the spring of 2011, Mr. Dukes was charged in Virginia with conspiracy to distribute cocaine. Drug agents in Virginia suggested that he contact agents in Tennessee about becoming a CI. Mr. Dukes was paid for working as an informant, and he was not made any promises by Corporal McQueen about his pending Virginia charges in exchange for working as a CI. Thereafter, Mr. Dukes arranged controlled crack cocaine buys that took place on September 1, 10, 15, and 26, 2011, and on October 12, 17, and 24, 2011, and finally on November 7, 2011. Defendant Graham was Mr. Dukes'[s] contact for purchasing the cocaine.

> Concerning the standard procedure for each of the controlled drug buys, Corporal McQueen testified: "Our deals are uniform. We try to make them all the same." He said that the CI would notify the DTF when there was an opportunity to buy drugs. At least two DTF agents would then meet the CI at a predetermined location, and the CI would make a recorded call

---

[1] From the record, it appears there were five defendants charged in this case. Mr. Garrick was the only codefendant tried with the Defendant.

to the "target." Once a controlled buy was arranged, the DTF agents would search the CI and his vehicle for money, weapons, and narcotics. The CI would be given recording equipment and "buy money" to purchase the drugs. The controlled buy was then monitored by the agents. After the drug buy, the CI and DTF agents would meet at a predetermined location, and the agents would recover physical and recorded evidence, and a statement would be taken from the CI. The DTF agents would again search the CI and his vehicle. Corporal McQueen testified that the standard procedures were followed during each of the controlled buys involving Mr. Dukes and Defendant Graham and [the Petitioner].

Mr. Dukes called Defendant Graham on September 1, 2011, to arrange the first drug buy. He met the DTF agents at the predetermined location and was given $1,000 to make the purchase. Mr. Dukes drove to his sister's house [ ], met Defendant Graham, and purchased twenty rocks of crack cocaine. Mr. Dukes noted that during the audio recording of the transaction, he attempted to negotiate a price for the drugs with Defendant Graham in order to build a "rapport" with him. Corporal McQueen and Mr. Dukes testified that there was no video of the buy because Mr. Dukes damaged the equipment when he dropped it. Agents observed Mr. Dukes walk into the house, and they monitored the audio of the transaction.

Agent Ashley Cummings, a forensic scientist with the Tennessee Bureau of Investigation (TBI) Chemistry Drug Identification Section, later performed chemical testing on a sample of the "rocklike substance" obtained during the controlled buy on September 1, 2011. The tested sample contained 1.46 grams of cocaine.

Mr. Dukes called Defendant Graham to arrange the second controlled buy which took place on September 10, 2011. Mr. Dukes met the agents and was given $1,300 to make the purchase. Mr. Dukes then drove to his sister's house [ ] where he negotiated with Defendant Graham and purchased 34 rocks of cocaine for $1,250. Corporal McQueen testified that the equipment was again malfunctioning but there was an audio recording of the second drug buy. On the audio recording, Defendant Graham could be heard counting out thirty-four rocks of crack cocaine.

Agent Ashley Cummings of the TBI later tested the substance obtained during the controlled buy on September 10, 2011. The tested sample contained 1.98 grams of cocaine.

- 3 -

Mr. Dukes called Defendant Graham and arranged a third controlled buy on September 15, 2011. The transaction again took place at Ms. Dukes['s] house [ ]. This time the transaction was videotaped. Defendant Graham sold Mr. Dukes thirty-four rocks of crack cocaine for $1,250. During the meeting Defendant Graham discussed another package of crack cocaine in his possession containing 600 rocks of cocaine. Mr. Dukes testified that the package of cocaine was in a big bag and was "[m]uch bigger than the amount he had bought from Defendant Graham.

Agent Carl Smith, a forensic scientist with the TBI, performed a chemical analysis on the "rocklike substance" purchased on September 15, 2011. He tested samples from "several small corner bags" which he determined contained .71 grams of cocaine. The gross weight of the remaining substance was 14.16 grams.

Mr. Dukes arranged a fourth buy from Defendant Graham on September 26, 2011. The two "talk[ed] back and forth," and the discussions led to a meeting at the IHOP restaurant located on East Stone Drive in Kingsport. Agents followed Mr. Dukes to the restaurant and identified a blue/green Buick LaSabre known to be Defendant Graham's vehicle in the parking lot. Lieutenant Brad Tate of the Bristol Police Department, who was assigned to the DTF, testified that he saw Defendant Graham sitting at the table with Mr. Dukes in the restaurant. While there, Defendant Graham sold Mr. Dukes 58 rocks of cocaine for $2,300. Defendant Graham also agreed to introduce Mr. Dukes to [the Petitioner]. After a short amount of time, Lieutenant Tate saw Mr. Dukes and Defendant Graham walk out of the restaurant and get into the Buick LaSabre.

Agent Jacob White, a forensic scientist with the TBI, performed chemical testing on a sample of the "rocklike substance" purchased on September 26, 2011. The substance was packaged in "58 knotted individual corner plastic bags." The substance in three of the bags tested positive for cocaine, and the total weight of the three bags was 1.01 grams. The gross weight of the other 55 bags, including the packaging, was 23.68 grams.

Mr. Dukes contacted Defendant Graham about a fifth controlled buy on October 12, 2011. Mr. Dukes met Defendant Graham at [Ms. Dukes's residence]. While there, Defendant Graham called [the Petitioner] on a cell phone because Defendant Graham did not have the full amount of crack

- 4 -

cocaine that Mr. Dukes was trying to purchase. Mr. Dukes also spoke with [the Petitioner] over the phone about purchasing 21 grams of cocaine for $2,000. Mr. Dukes testified that he only had $1,800 in buy money, and Defendant Graham agreed to cover the remaining amount so that [the Petitioner] would not complain. At some point, Mr. Dukes and Defendant Graham left the house [ ] and drove to a carwash [ ] to meet [the Petitioner]. On the way, Mr. Dukes and Defendant Graham had a recorded conversation about "[g]oing to the source or cutting out the middle man."

When they arrived at the car wash, Mr. Dukes got into [the Petitioner]'s vehicle, and [the Petitioner]'s wife, Teresa Holder, was also in the vehicle with him. Defendant Graham remained outside and washed [the Petitioner]'s vehicle. In a recorded conversation while in the vehicle, [the Petitioner] and Mr. Dukes discussed how $150 to $200 could be made by selling .5 grams of crack cocaine. Mr. Dukes testified that they also discussed: "[Y]ou know, I was making so much money, you know, pushing what he just gave me, that I should give him some money to - when he goes back to his source to get more to bring back more." Mr. Dukes also told [the Petitioner] that he thought Defendant Graham had been taking advantage of Mr. Dukes because there was a lot of "shake" in a couple of buys that Mr. Dukes had made from Defendant Graham. Mr. Dukes then paid [the Petitioner] $2,000 for crack cocaine.

Agent John Scott, a forensic scientist with the TBI, performed chemical testing on the sample of the "rocklike substance" purchased on October 12, 2011. The sample tested positive for crack cocaine. The total weight of the substance was 26.34 grams.

Mr. Dukes arranged for a sixth controlled buy with Defendant Graham on October 17, 2011. He spoke with Defendant Graham by phone, and they discussed Mr. Dukes purchasing 21 grams of cocaine for $2,000 which Mr. Dukes felt was too expensive. Mr. Dukes said, "I'm paying almost street value what a crack head would pay." Mr. Dukes then called [the Petitioner] to negotiate a price for the cocaine. Mr. Dukes spoke to Defendant Graham again, and Defendant Graham indicated that if Mr. Dukes "bought two ounces sitting at 24 grams [he would] only have to pay $1,800 a piece." They discussed that the two ounces would be purchased from [the Petitioner]. Mr. Dukes testified that the numbers given to him by Defendant Graham came from [the Petitioner].

Mr. Dukes later met [the Petitioner] at the IGA parking lot located on West Sullivan Street, and [the Petitioner] got into the car with him. Corporal McQueen observed [the Petitioner] get into the vehicle. [The Petitioner]'s wife or fiancée was in [the Petitioner]'s vehicle. They had a discussion about 28 grams of cocaine, and whether Mr. Dukes had brought the correct amount of money. Mr. Dukes testified that he purchased crack cocaine from [the Petitioner], and on the video of the transaction, [the Petitioner] could be heard counting the money that had been given to Mr. Dukes by the DTF. Officer Grady White of the Kingsport Police Department assisted the DTF on October 17, 2011. He followed a silver Subaru Outback for a short distance and then made a stop of the vehicle for changing lanes without using a signal. [The Petitioner] was driving the vehicle, and Teresa Holder was in the passenger seat.

Agent Sharon Norman, a forensic drug chemist with the TBI, performed chemical testing of the substance purchased on October 17, 2011. The substance tested positive for cocaine and weighed 20.93 grams.

Mr. Dukes arranged a seventh controlled buy with Defendant Graham, and they met [ ] on October 24, 2011. They discussed [the Petitioner]'s cocaine prices and amounts. At [the Petitioner]'s request, Mr. Dukes then drove to the Perfect Pair, a business located on Stone Drive and owned by [the Petitioner] and Teresa Holder. Defendant Graham arrived at the business after Mr. Dukes. Mr. Dukes then gave [the Petitioner] $1,950 to purchase crack cocaine, and [the Petitioner] gave the drugs to Defendant Graham. Mr. Dukes drove back to [Ms. Dukes' residence], and Defendant Graham delivered the cocaine to him. Mr. Dukes noted that the cocaine appeared to be wet.

Agent David Holloway, a forensic drug chemist with the TBI, performed chemical testing on the substance purchased on October 24, 2011. The substance tested positive for cocaine and had a total weight of 25.31 grams.

Mr. Dukes arranged an eighth controlled buy on November 7, 2011. He initially called Defendant Graham, who did not answer. Mr. Dukes then spoke to [the Petitioner]. He later met [the Petitioner] at the Perfect Pair and purchased a one-half ounce "chunk" of crack cocaine for $1,000. Since [the Petitioner] did not have the full amount of drugs that Mr. Dukes had requested, Mr. Dukes called Defendant Graham and began negotiating another drug transaction in [the Petitioner]'s presence. Defendant Graham

- 6 -

offered to sell Mr. Dukes 22 rocks of cocaine for $1,700. Mr. Dukes testified that [the Petitioner] did not want anything that he ([the Petitioner]) said, during Mr. Dukes' conversation with Defendant Graham, relayed to Defendant Graham. Mr. Dukes told [the Petitioner] that Graham had 22 rocks for $1,700. Mr. Dukes then overheard [the Petitioner] talking on the phone to Defendant Graham. Later that day, Mr. Dukes drove to the carwash located [on] Lynn Garden Drive. [The Petitioner] then arrived at the carwash and sold Mr. Dukes an additional 22 rocks of cocaine for $900. Mr. Dukes testified that he knew the 22 rocks of crack cocaine came from Defendant Graham because of the "way it looked." The 22 rocks that Mr. Dukes had purchased earlier from Defendant Graham were individually wrapped.

Agent Michael Bleakley, a forensic drug chemist with the TBI, tested the "rocklike substance" purchased on November 7, 2011. One "larger piece" of the substance weighed 6.62 grams and tested positive for cocaine. The substance in two "small corner bags" had a gross weight, including packaging, of 8.69 grams. Agent Bleakley testified that the total weight of the substance submitted was less than 26 grams.

Steven Starnes is the Geographic Information Systems (GIS) analyst and principle cartographer for the City of Kingsport. He is an expert in the fields of cartography and GIS analysis for the City of Kingsport. Mr. Starnes testified that he created "drug buffer" maps for use in the present case. The maps demonstrated that the IHOP Restaurant located at 1201 East Stone Drive was within 1,000 feet of the Boys and Girls Club of Kingsport, which is a recreational center. The carwash located at 525 Lynn Garden Drive, where the controlled drug buy on October 12, 2011, occurred, is within 1,000 feet of the Andrew Jackson Elementary School. Another map prepared by Mr. Starnes demonstrated that the IGA store located at 433 West Sullivan Street is within 1,000 feet of the Play Center, which is a child daycare facility.

*Murchison*, 2016 WL 659844, at *1-4.

Following the trial, the trial court merged counts 11 and 12, counts 13 and 14, counts 15 and 16, and counts 21 and 22. The Petitioner received twelve-year sentences for counts 11, and 14. He received twenty-five-year sentences for counts 9, 15, and 21. The trial court imposed concurrent sentences for counts 11, 14, 15, and 21 to be served consecutively to the twenty-five-year sentence in count 9 for an effective fifty-year sentence.

## B. Post-conviction Hearing

The Petitioner filed a *pro se* petition for post-conviction relief, alleging that he received the ineffective assistance of counsel. At the hearing on the petition, the Petitioner testified that his trial attorney ("Counsel") did not convey any settlement offers to him. The Petitioner said that Counsel told him that the State would not negotiate a settlement in this case and that the only option was trial. The Petitioner identified a December 6, 2012 letter from Counsel, explaining that the State was not going to make an offer for settlement. The letter further outlined the Petitioner's right to testify, present witnesses, and present evidence. Attached to the letter were documents indicating whether the Petitioner intended to: 1) testify at trial; 2) present witnesses; and 3) present any other evidence. The Petitioner signed and dated each sheet indicating that he had chosen not to testify at trial, would not be calling any witnesses at trial, would not offer any documents at trial, and would not be offering any physical items as evidence at trial. The post-conviction court entered this letter and the attached pages into evidence.

The Petitioner testified that in 2016, after his 2013 trial, he requested Counsel's case files and found two plea offers from the State. The Petitioner stated that he had no knowledge of a December 2012 plea offer of eight years to serve at 100% or a March 2013 offer of fifteen years to serve at 100%. The Petitioner confirmed that, had he been aware of these offers, he "definitely" would have accepted either one in lieu of proceeding to trial.

The Petitioner testified that he met with Counsel three times in preparation for trial. The Petitioner testified that during these meetings, Counsel never discussed the State's discovery. The Petitioner stated that the first time he saw the State's video recordings of the drug transactions was during his trial. The Petitioner confirmed that he was tried with his co-defendant, Mr. Graham. He said that he believed their being tried jointly was to his disadvantage because the jury saw numerous videos of Mr. Graham engaged in drug deals. Even though the Petitioner was not depicted in many of the recordings, he believed the jury might see Mr. Graham and the Petitioner as acting jointly since their cases were tried together. The Petitioner said that he asked Counsel why he was being tried with Mr. Graham and Counsel told the Petitioner there was no option. The Petitioner confirmed that, when he reviewed the case file, Counsel had not filed a motion to sever.

The Petitioner testified that through "the whole process" he did not understand "what was going on," which made him nervous. The Petitioner stated that Counsel never explained that his charges had mandatory sentences or the possibility of consecutive sentencing. He said that he learned about sentencing upon arriving in prison. The

Petitioner said that his reading level was low and that he had been assigned to special education courses while in school. He stated that he never completed high school. He said that Counsel was unaware of his limitations because he never asked the Petitioner about his "mental capabilities."

The Petitioner testified that he asked Counsel about hiring an investigator but that Counsel told him there was no available State funding for an investigator. The Petitioner agreed that he met with a probation officer prior to sentencing to help complete the presentence report. The Petitioner said he discussed his family history but never provided any statement regarding his drug use or drug sales. At the sentencing hearing, however, an alleged statement from the presentence report was used against him. The Petitioner said that he requested a copy of this statement but was never provided one.

On cross-examination, the Petitioner clarified, with respect to his testimony about his mental capacity, that a trial was "a new process" for him, thus he did not understand all of the procedures and needed his attorney to explain it to him. The Petitioner said that the last school grade that he finished was eighth or ninth grade when he was fourteen-years old. The Petitioner never pursued his GED. As an adult, the Petitioner moved to North Carolina where he obtained a "temporary job" working in a warehouse. He stated that he was also unemployed during his time in North Carolina but received disability benefits based on his "mental and physical health." The Petitioner stated that he had not brought any proof to the hearing, other than his testimony, about the determination of the disability that served as a basis for his disability payments. The Petitioner stated that he could read "[a] little bit" and write.

The State provided the Petitioner with a letter written by Counsel to the Petitioner. The Petitioner confirmed that it was his address on the letter but denied receiving the letter. The contents of the letter discussed a pending bond hearing. The Petitioner recalled that he learned about the bond hearing, not from a letter, but during a meeting with Counsel at a McDonald's restaurant. The State provided the Petitioner with letters from Counsel addressed to the Petitioner dated May 24, 2012, and June 26, 2012. The Petitioner confirmed his address on both letters but denied receiving either letter.

As to the December 6, 2012 letter, the Petitioner stated that he did not receive this letter in the mail but that Counsel gave it directly to him during one of their meetings at the McDonald's restaurant. As to the attached pages signed by the Petitioner indicating his decisions about whether to testify or present witnesses, the Petitioner identified his signature on each page. The Petitioner said that Counsel told him, "This right here says that you're not going to testify. Well you're not going to testify, you're not bringing no witnesses." The Petitioner said that Counsel did not ask the Petitioner what he wanted to do or explain the documents but told him what was going to happen and to sign the

document. The Petitioner said that he did not ask any questions because Counsel was "my attorney."

The Petitioner testified that when he did ask Counsel questions about his case, he felt Counsel's basic attitude was "Don't ask me nothing. I know what I'm doing." The Petitioner said that he never asked Counsel about witnesses but that he did ask Counsel one time about the State's evidence against him. He recalled that Counsel's response was "[b]asically that he had this under control." The Petitioner said that Counsel never told him about the evidence against him.

The Petitioner denied ever asking Counsel about a motion to sever. He said that he asked Counsel why he and his co-defendant were going to trial together and that Counsel said "they was going to split us up." About potential defense witnesses at trial, the Petitioner clarified that, during the trial, he told Counsel that his girlfriend "Ms. Teresa" could testify on his behalf.

The State presented the Petitioner with a letter from Counsel addressed to the Petitioner and dated December 19, 2012. The Petitioner denied having ever received the letter. The State presented the Petitioner with a letter from Counsel addressed to the Petitioner and dated January 1, 2013. The letter discussed the discovery in the Petitioner's case. The Petitioner denied having ever received the letter. Finally, the State presented the Petitioner with a letter from Counsel addressed to the Petitioner dated March 25, 2013. This letter contained a plea offer for a fifteen-year sentence to be served at 100%. The Petitioner denied seeing that letter before trial and said that Counsel never discussed this offer with him. The Petitioner agreed that the letter stated that all five co-defendants would have to accept their respective plea offer for the offer to be valid. The Petitioner agreed that his co-defendant Mr. Graham proceeded to trial. The Petitioner stated that he did receive one letter, while out on bond, from Counsel about an alibi witness.

The Petitioner testified that he did not ask Counsel before trial about investigating the alleged distances as related to the Drug-Free School Zone Act or the potential fingerprints on the bags of drugs. He said that he asked Counsel about these issues during the trial. The Petitioner said that he never asked Counsel about a mental capacity evaluation. He confirmed that Counsel never discussed with him a potential sentence if convicted at trial. The Petitioner said that, at the time of his sentencing, he was completely unaware of the presentence report.

On cross-examination, the Petitioner testified that he met with Counsel at a McDonald's restaurant on three occasions before the trial. On one occasion they discussed a bond hearing, and on the other two occasions, they discussed the trial. The

Petitioner agreed that he needed Counsel to explain the process to him because it was his first trial but that he also needed assistance because of his "reading abilities." The Petitioner read aloud from the State's plea offer, "In the event that some of the codefendants but not all five want to accept this offer please let me know and I will evaluate the scenario on a case by case basis."

Counsel testified that he had been practicing law for forty-seven years and criminal defense law for seventeen years in state and federal courts. Counsel began representation of the Petitioner in March 2012. Counsel said early in his representation, he contacted the State to inquire about the possibility of a plea agreement. The State indicated initially that it would not be making an offer to plea in this case.

Counsel testified that when he began representing the Petitioner, the Petitioner was on pretrial release. The State filed a motion to determine from where the funds for the bond had originated, seeking to determine if it was from an improper source. Counsel said that his initial conversations with the Petitioner were focused on the bond issue because this issue was "extensive." The Petitioner wanted to remain out of jail while awaiting trial. Counsel said that, at the hearing on the State's motion, he was able to establish that the money for the pretrial release bond did not come from an improper source, allowing the Petitioner to remain released from jail on bond.

Counsel testified that he kept extensive notes in most cases to document an occurrence or development in a case and what needed to be done next in a case. Counsel identified his computer-generated notes on the Petitioner's case. Counsel said that he met with the Petitioner a number of times as was documented in his notes. Although initially they discussed the bond hearing, following the hearing, they prepared for trial during their meetings. Counsel explained that after learning that the State would not be making an offer, he advised the Petitioner that they "needed to be thinking about trial."

Counsel testified that in his meetings with the Petitioner, Counsel asked the Petitioner questions about the case, and the two reviewed "all aspects" of the case. Counsel said that the Petitioner's responses to his questions were all appropriate, giving him no reason to question the Petitioner's mental capacity. Counsel said he was "impressed" with the Petitioner's ability to understand many of the "really difficult issues in the bond matter." Counsel said that the Petitioner never mentioned any type of mental limitation or lack of capacity. Counsel stated that any letters he sent to the Petitioner included a return address and that none of the letters he sent were returned. Counsel said that he "regularly" spoke with the Petitioner on the phone and that some of those conversations referenced the substance of the letters Counsel had sent.

Counsel testified that when he received the State's first offer to settle the case for eight years at 100%, he attempted to call the Petitioner numerous times. The same number he had used to previously contact the Petitioner resulted in a recording indicating that the phone was no longer in service. Counsel then attempted to contact "Teresa," the Petitioner's friend, and received the same message. After repeated attempts to contact the Petitioner, Counsel prepared and sent the letter dated December 19, 2012, advising of the State's offer and asking the Petitioner to call him. The Petitioner called in response to the letter, but Counsel was unable to speak with him at the time and asked the Petitioner to call him the following day. The Petitioner did not call Counsel again until December 27, 2012. At that time, the two discussed the State's offer, and Counsel explained all aspects of sentencing.

Counsel testified that, contrary to the Petitioner's assertion, Counsel did not want to try the case. Counsel said that the Petitioner refused both of the State's offers to settle the case. He declined the State's first offer of an eight-year sentence three times and the second offer for a fifteen-year sentence twice. Counsel said that the Petitioner repeatedly told him he wanted to try his case, and Counsel told the Petitioner that it was going to be "a very difficult case to defend." Counsel explained that the State's evidence against the Petitioner was "overwhelming." He recalled that the evidence against the Petitioner included a CI with "reliable credible testimony," the testimony of multiple law enforcement officers, and recordings of the transactions.

Counsel testified that he received a letter by fax on March 25, 2013, in which the State "unexpectedly" made a second offer. Counsel called the Petitioner and conveyed the offer of fifteen years to be served at 100%. After reviewing it together, the Petitioner declined the offer. After speaking with an assistant district attorney, Counsel again approached the Petitioner about whether he wanted to accept the State's offer, and the Petitioner indicated that he did not.

Counsel testified that he requested discovery from the State, and the State provided it in two "rounds." Counsel stated that he and the Petitioner did not review the discovery "side by side." He reviewed the discovery first and then provided it to the Petitioner. The first set of discovery included videos, and so Counsel asked the Petitioner whether he had a way to review the recordings. The Petitioner confirmed that he had a laptop computer he could use to watch the recordings. When Counsel received the second "round" of discovery from the State, after review, he gave it to the Petitioner. The Petitioner returned the discovery to Counsel and said that he had "thoroughly reviewed" the discovery. Following their review of the discovery, Counsel said he was available to the Petitioner for any questions about the discovery as they prepared for trial.

Counsel testified that the Petitioner never asked him to file a motion to sever. Counsel said that he considered filing a motion to sever but that he decided it was "a bad trial strategy." He explained that, in his experience, when there is evidence indicating that a defendant is a leader or has major involvement in an offense, it is better if it appears the defendant was "a member of the group" rather than viewed as an individual shouldering all of the responsibility. Based upon the evidence he reviewed, Counsel was concerned that the Petitioner might appear to be the leader in the offense. Further, Counsel was aware that Mr. Graham's attorney had unsuccessfully argued for severance. Counsel believed severance was unlikely since the initial charges involved conspiracy.

Counsel testified that the Petitioner never asked him to investigate the distance between the transactions and a school zone, but he investigated the distances. The information provided in discovery allowed Counsel to determine the distances and "every offense was well within the 1,000 feet statutory distance." Counsel said that the distance was "really never an issue in the case" and the State easily proved the transactions occurred within the statutory distance. Nonetheless, Counsel attacked the State's witness at trial about why the distance is measured "as the crow flies" rather than the actual path a person would walk to reach a protected location. The State witness agreed that in several instances the distance would have been more than 1,000 feet if measured by how a person walked.

Counsel testified that the Petitioner never asked him to investigate whether there were fingerprints on the bags containing drugs but that "it wouldn't have made any difference" due to the overwhelming evidence against the Petitioner. Counsel recalled that some of the video recordings depicted the Petitioner in the transactions and that the testimony offered by law enforcement was "very persuasive."

Counsel testified that he provided the Petitioner with a copy of the presentence report before the sentencing hearing. Counsel identified the letters, previously shown to the Petitioner, from Counsel addressed to the Petitioner discussing various aspects of the case. Additionally, Counsel identified an April 23, 2013 letter which stated, "I anticipate receipt of your presentence report the week of May the 13th. As soon as I receive the presentence report I will review it with you and we can plan our defense of sentencing."

On cross-examination, Counsel agreed that he was appointed on this case and that his hours submitted to the Administrative Office of the Courts for payment reflected that he met with the Petitioner three times. Counsel explained that this was a "huge case" that he worked on for almost two years. He knew from the onset that he would not be paid for all of his work and, thus, he did not report all of his work. Even with reducing what he reported, he was "way over the limit for court appointed counsel" and did a great deal

of work on the case for which he was never compensated. He agreed that he recorded "some" of his meetings with the Petitioner but not "every meeting."

After hearing the evidence, the trial court denied the Petitioner relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner maintains that he received the ineffective assistance of counsel. Specifically, he alleges that Counsel was ineffective for failing to: (1) convey plea offers; (2) review discovery with the Petitioner; (3) file a motion to sever; (4) inquire into the Petitioner's mental capacity; (5) adequately investigate; (6) inform the Petitioner of his potential sentences; and (7) object to statements in the presentence report. The State responds that the Petitioner received effective assistance of counsel and that the Petitioner has failed to present proof to sufficiently support his claims. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that

counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

- 15 -

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. Plea Offers

The Petitioner asserts that Counsel did not directly convey to him two plea offers from the State. The State responds that the Petitioner has failed to prove this claim by clear and convincing evidence. The trial court accredited Counsel's testimony that he conveyed both plea offers multiple times and encouraged the Petitioner to accept both offers. As to this issue, the post-conviction court made the following findings:

[T]his Court accredits the testimony of [Counsel]. I do not accredit the testimony of [the Petitioner]. I find his testimony to be incredible. [Counsel's] testimony was that he did in fact convey the plea offers, urged [the Petitioner] to accept the plea and [the Petitioner] was adamant that he was not going to do that and Exhibit 3 [Counsel's notes] corroborates and Exhibit 4 [Counsel's letters to the Petitioner] corroborates that testimony.

The post-conviction court accredited counsel's testimony and found that Counsel conveyed to the Petitioner the State's offers. The record does not preponderate against the findings of the post-conviction court. Counsel testified that he did not want to try the case based upon the State's overwhelming evidence against the Petitioner. This proof included a CI's testimony, recordings, and law enforcement testimony. At Counsel's inquiry, the State initially declined to make an offer but did so on December 18, 2012, as documented in Counsel's notes. Counsel was unable to make contact with the Petitioner by telephone so instead sent a letter outlining the offer and asking the Petitioner to call him. This letter was an exhibit at the post-conviction hearing, and the Petitioner confirmed that the mailing address was correct. The Petitioner called twice in response to the request in the letter and on the second occasion, the Petitioner and Counsel discussed the State's offer. Counsel also testified to a second offer in March 2013, that the Petitioner also declined. Other than his own testimony, the Petitioner failed to provide any evidence which indicates that Counsel did not convey the State's offers. The post-conviction court accredited Counsel's testimony, and this Court will not re-weigh the credibility findings of the post-conviction court. *See Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997).

Accordingly, we conclude that Counsel conveyed to the Petitioner both of the State's plea offers. The Petitioner has failed to show that Counsel was deficient as to the settlement offers and, therefore, is not entitled to relief on this issue.

## B. Discovery

The Petitioner asserts that Counsel failed to review discovery with the Petitioner. The State responds that, based upon the post-conviction court's credibility determination, the Petitioner has failed to prove this allegation by clear and convincing evidence. We agree with the State.

The trial court made the following findings as to this issue:

> [Counsel's] testimony was that he gave [the Petitioner] the entire discovery. [Counsel] testified that he asked [the Petitioner] whether or not he had the means to view the videos. [Counsel] testified that he followed up in other correspondence, meetings and conversations that he had with [the Petitioner] whether he had in fact reviewed the discovery materials. [Counsel] testified that [the Petitioner] had assured him that he did in fact go over discovery. The Court accredits the testimony of [Counsel]. I do not accredit the testimony of [the Petitioner] where he just gave a blanket statement that he didn't receive the discovery.

The evidence does not preponderate against the post-conviction court's findings. The Petitioner testified that he never received discovery and that Counsel never provided him with discovery. The Petitioner testified that he did not see the State's recordings until his trial. Counsel testified that he requested discovery and received two sets of discovery from the State. He provided both to the Petitioner, who, upon returning the discovery, confirmed that he had reviewed it. The Petitioner's testimony was in direct conflict with Counsel's and the post-conviction court found Counsel's testimony credible. This Court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. *State v. Nichols*, 90 S.W.3d 576, 586 (Tenn. 2002). Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. *Id*. (citing *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997)).

Accordingly, we conclude that the Petitioner has not proven by clear and convincing evidence that Counsel was deficient with regard to the discovery. Although, Counsel and the Petitioner did not review the discovery "side by side," Counsel provided the Petitioner with the discovery, ensured the Petitioner had the ability to review aspects of the discovery such as the recordings, and confirmed that the Petitioner did in fact

- 17 -

review the discovery "thoroughly." Thereafter, Counsel was available to discuss any questions the Petitioner had related to the discovery as they prepared for trial. The Petitioner is not entitled to relief.

## C. Motion to Sever

The Petitioner asserts that Counsel was ineffective because he failed to seek severance of his case from Mr. Graham's. The State responds that Counsel made a sound strategic decision not to move for severance; therefore, Counsel was not deficient. The State also contends that the Petitioner has failed to prove prejudice in light of Mr. Graham's unsuccessful motion to sever. We agree with the State.

The post-conviction court made the following findings:

> [Counsel] testified that [the Petitioner] never asked him to file a motion to server [sic] which is in direct contradiction to [the Petitioner]'s testimony. [Counsel] stated that based on his considered experience it was bad trial strategy. [Counsel] also testified that he was aware that Mr. Graham, the codefendant, had filed a motion to sever and was aware of that motion as it was proceeding through the court. The Court accredits the testimony of [Counsel], and does not accredit the testimony of [the Petitioner]. The Court finds that [the Petitioner] has an interest in the outcome of the case and that during his testimony he made outlandish and improbable statements.

The evidence does not preponderate against the post-conviction court's findings. Counsel testified that he considered whether to file a motion to sever but, based upon his experience at trial and the specific evidence in this case upon which a jury might find the Petitioner was the leader in the offense, Counsel made the decision not to pursue severance. Further, Counsel was aware that the Petitioner's co-defendant's attorney had unsuccessfully filed a motion to sever. In light of the fact that the charges involved conspiracy, which requires the State prove the involvement of two or more persons, Counsel thought severance was unlikely. *See* T.C.A. § 39-12-103(a) (2014). Considering all of these factors, Counsel made an informed, strategic decision not to seek severance. We cannot conclude that Counsel's performance was deficient or that Counsel's failure to file a motion to sever prejudiced the Petitioner at trial. The Petitioner is not entitled to relief.

## D. The Petitioner's Mental Capacity

The Petitioner argues that Counsel's failure to "investigate or use the Petitioner's mental capacity as a mitigating circumstance" was deficient. The State responds that Counsel had no cause for concern regarding the "mental deficits" and the Petitioner provided "no credible evidence of any mental deficiency" at the post-conviction hearing.

The post-conviction court made the following findings:

[Counsel] testified that [the Petitioner] was, he didn't use the word savvy, but that's the impression that the Court took especially in dealing with the bond issue, that [the Petitioner] understood some very complex legal issues that were being presented by the State in an effort to revoke his bond. [Counsel] testified that [the Petitioner] understood those issues and was able to assist him in coming[.]

The evidence does not preponderate against the post-conviction court's findings. It is well-established that

the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions . . . And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Strickland*, 466 U.S. at 691. Counsel testified that the Petitioner did not exhibit any signs or indications of impairment. The Petitioner demonstrated understanding of complex issues related to the bond revocation and contributed to his defense. His communication with Counsel raised no concerns; therefore, Counsel did not have reason to believe that an assessment was needed or would prove beneficial. Other than the Petitioner's assertions that he was assigned to special education classes in grade school, there is no evidence to support an alleged mental condition. As such, the Petitioner has failed to carry his burden of proving this allegation by clear and convincing evidence. He is not entitled to relief.

### E. Adequate Investigation

The Petitioner asserts that Counsel failed to adequately investigate his case. Specifically, he argues that Counsel should have hired an investigator to measure the distances in support of violation of the School-Zone Act and that he should have had the bags containing the drugs analyzed for fingerprints. The State responds that the Petitioner failed to present evidence at the post-conviction hearing in support of these issues.

The post-conviction court made the following findings:

With regard to the failure to investigate the distance of the school zone being 1,000 feet, [the Petitioner] testified that he wanted [Counsel] to get an investigator and confirm the distances independently, not just by looking at the State's map that was provided in discovery. Then he turns around and testifies that because of his mental issues and his learning disabilities that he didn't understand what was going on in his case but he testifies that he didn't feel that he was able to ask questions when he did meet with [Counsel] and then went to great lengths to tell, testify as to how [Counsel] would "shoosh" him, that [Counsel] had everything under control and that he didn't need to hear from [the Petitioner]. Based on the testimony and the way that [the Petitioner] handled himself here today the Court finds that impossible to believe. [The Petitioner], when he testified he was engaged, he understood the questions. He answered beyond appropriately. [Counsel] testified that he never asked him to do those investigatory issues either the 1,000 foot of the school zone or the fingerprints on the baggies. [Counsel] testified that he did in fact do his own investigation by measuring the maps to ensure that they were the points of the sale or the interactions were in fact within 1,000 feet of the school zone. [Counsel] testified that interactions were well within 1,000 feet and he testified as to arguments that he made at trial, or at least attempted to make at trial to get the jury to go along with him to say, "Look people are ---- you know, people use drugs, crows don't use drugs so you shouldn't go as the crow flies, you should go as the people walk," and that line of defense was not allowed by Judge Montgomery; however, [Counsel]'s testimony shows that he did investigate that issue. So as it relates to the 1,000 feet of a school [Counsel]'s performance was not deficient under Strickland and Baxter.

With regard to the baggies, [the Petitioner]'s testimony was that fingerprint analysis should have been [done] and he didn't give any other testimony about the baggies, specifically what prejudice he suffered. [Counsel] testified that regardless of what any test would have shown that the videos showed that [the Petitioner] was involved in the transactions and that the evidence otherwise was overwhelming, so even if [Counsel]'s performance in not having baggies tested was deficient under Strickland and Baxter the Court is of the opinion that based on the circumstances of this case and the evidence introduced at trial in this case that there's no prejudice.

- 20 -

The Petitioner's first contention is that Counsel failed to thoroughly investigate the distance between the drug transactions and school and child daycare facility zones. The Petitioner, however, failed to present a single witness at the post-conviction hearing or any evidence to show that any of the transactions were outside the school or child day care facility zones. The burden is on the Petitioner to prove both inadequacy of performance of counsel, as well as prejudice from that inadequacy. *Strickland*, 466 U.S. at 693; *Baxter*, 523 S.W.2d at 936. The only way to establish the existence of, the discoverability of, and the potential prejudicial value stemming from the failure to hire an investigator to measure the distances is to present that evidence at the post-conviction hearing. We conclude that the Petitioner has failed to meet his burden on this contention.

Likewise, the Petitioner failed to introduce any evidence in support of the claim that he was prejudiced by Counsel's failure to submit the baggies containing the drugs for fingerprint analysis. Counsel testified that, given the weight of the evidence against the Petitioner, he did not believe that fingerprint evidence would have changed the outcome of the trial. The State's evidence against the Petitioner was strong. A CI testified about his direct contact, conversations, and interactions with the Petitioner related to buying drugs. The State showed the jury video and audio recordings of the Petitioner engaged in drug transactions and law enforcement testified about their observations of the Petitioner during the drug sales. Even were we to speculate that the results of fingerprint analysis would have resulted in an absence of the Petitioner's fingerprints on the baggies, it would not have changed the outcome of the trial. As such, the Petitioner has failed to show that Counsel was deficient for failing to pursue fingerprint analysis or that the Petitioner was prejudiced by the alleged deficiency. The Petitioner is not entitled to relief as to this issue.

### F. Potential Sentences

The Petitioner complains that Counsel failed to inform the Petitioner of his potential sentences. The State responds that the Petitioner fails to present clear and convincing evidence in support of his claim. The post-conviction court made the following findings:

> The testimony from [Counsel] was that he did inform [the] Petitioner of the potential sentence, and, of course, [the Petitioner] denies that he was ever informed of the sentence. [Counsel's] testimony was corroborated by his file notes (Exhibit 3). The Court finds that by accrediting the testimony of [Counsel] that he did in fact inform [the Petitioner] of the potential sentences that he was facing.

The evidence does not preponderate against the post-conviction court's findings. As we earlier noted, the post-conviction court accredited Counsel's testimony, and this Court will not re-weigh the credibility findings of the post-conviction court. *See Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578–79 (Tenn. 1997). Counsel testified that he discussed with the Petitioner his potential sentence, consistent with his contemporaneous notes related to the Petitioner's case. The Petitioner has failed to carry his burden of proving that Counsel was deficient in this regard. He is not entitled to relief.

## G. Statement in Presentence Report

The Petitioner contends that Counsel should have objected to the introduction of the presentence report during sentencing. He asserts that the presentence report contained statements that he did not make. The State responds that the Petitioner has failed to establish that Counsel was deficient or any resulting prejudice.

The post-conviction court made the following findings:

[The Petitioner] testified that he didn't know what a presentence report was, that he'd never heard of a presentence report. However, [the Petitioner] did testify that he met with the probation officer, gave her information about his family, gave her information about his employment and his education, and told her that he had learning disabilities. Once again [the Petitioner] is telling the Court two different things, one right after the other, which are contradictory. [The Petitioner] acknowledged favorable information that he gave to the probation officer was included in that report. [The Petitioner] denied that the damaging information that was included in the report was given by him.

The Petitioner does not identify which statement or statements in the presentence report are false and should not have been in the report. Further, the Petitioner offered no proof in support of his allegation that the challenged statement or statements were false. *See Black v. State,* 794 S.W.2d 752, 757. As such, we conclude that the Petitioner has failed to carry his burden of proving this allegation by clear and convincing evidence. He is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE